## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD KOCHER, Derivatively on Behalf of Nominal Defendant COINBASE, INC., | C.A. No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| BRIAN ARMSTRONG, ALESIA J. HAAS, JENNIFER N. JONES, MARC L. ANDREESSEN, FREDERICK ERNEST EHRSAM III, KATHRYN HAUN, KELLY KRAMER, GOKUL RAJARAM, and FRED WILSON, | |
| Defendants, | |
| and | |
| COINBASE, INC., | |
| Nominal Defendant. | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Donald Kocher ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Coinbase Global, Inc. ("Coinbase" or the "Company") and against certain current and former officers and directors of the Company for violations of the Securities Act of 1933 (the "Securities Act"), breaches of fiduciary duties, unjust enrichment, abuse of control and gross mismanagement. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Coinbase and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and

other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Coinbase's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *In re Coinbase Global, Inc. Securities Litigation*, Case No. 5:21-cv-5634 (N.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Coinbase and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant Coinbase Global, Inc. against certain of the Company's current and former executive officers and members of the Board of Directors (the "Board") aiming to rectify the Defendants' violations of the Securities Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings, including the registration statement and prospectuses (collectively the "Registration Statement") in connection with the Coinbase's efforts to go public (the "Direct Listing"), from approximately April 14, 2021 to the present (the "Relevant Period").[1]

2.     On April 14, 2021, Coinbase became the first crypto company to go public. It offered investors an opportunity to invest in "crypto" but with the stability and security of an established large-cap company thanks to Coinbase's proprietary and trusted "platform," "significant scale," and, most importantly, proven "flywheel" growth strategy. These fundamental components of Coinbase's business, while once cornerstones of its operations, were

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately April 14, 2021 to May 13, 2021; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

misrepresented in the Registration Statement. In the months leading up to the Direct Listing, Defendants generated a massive influx of new users to Coinbase's "platform" through a heavy advertising and promotional campaign. These new users created an unprecedented spike in volume and trading activity, causing a breakdown in its operations, "platform" disruptions, and a rupture in the "flywheel" cycle that had been responsible for the company's historical growth. Defendants' efforts to increase Coinbase's numbers in advance of the Direct Listing backfired, leaving the Company and its newfound investors damaged and vulnerable to the competition.

3.     Coinbase described its "platform" in the Registration Statement as "a complementary suite of products and services . . . powered by a robust backend technology system." It was integral to the Company's growth strategy, which was represented as a "virtuous cycle" where new users increased liquidity that would, in turn, provide for the listing of new assets that could then be used to attract additional users and start the cycle all over again. As Coinbase stated in the Registration Statement, this cycle was a "powerful flywheel" that had "work[ed] effectively" to allow it to "grow[] rapidly" with "minimal outbound sales and marketing effort[s]." Indeed, since its inception, "over 90% of [Coinbase's] retail users had found [the company] organically or through word-of-mouth."

4.     In 3Q21[2], Defendants pivoted away from Coinbase's "organic[]" and "word-of-mouth" marketing and began a significant promotional and advertising campaign as they planned for the upcoming Direct Listing. Coinbase's "sales and marketing expenses," which primarily included "costs related to customer acquisition, advertising and marketing programs," increased from $24 million in 2019 to $57 million in 2020. Nearly half of these expenses were incurred in 4Q20 alone. In 1Q21 and 2Q21, just prior to and during the Direct Listing, these expenses

---

[2] "3Q20" refers to the third quarter of fiscal year 2020. Plaintiff uses this format in the Complaint to refer to Coinbase's fiscal quarters.

skyrocketed to $118 million and $196 million. Two of Coinbase's key metrics, "Assets on Platform" and "Trading Volume," illustrated the results of Defendants' marketing efforts. Between 3Q20 and 4Q20, these metrics spiked with both assets and volume on Coinbase's "platform" nearly tripling and doubling, respectively, and climbing even higher in 2021.

5.      The increased volume on Coinbase's "platform" ruptured its "flywheel" cycle as the Company encountered increasing service disruptions and delays in terms of adding new crypto assets. In 2019, Coinbase had a total of six "unanticipated system disruptions," which the Company described as "disruptions" that "typically last from minutes up to a few hours and are caused by periods of significant unexpected trading activity that cause delays in [its] trading service." In 2020, the number of Coinbase's "unanticipated system disruptions" doubled, rising to twelve; and in 1Q21 alone, Coinbase had five. Additionally, notwithstanding the wild popularity and demand for Dogecoin, it was markedly absent from Coinbase's "platform" while available through many of the company's competitors.

6.      Despite the strains of Defendants' promotional campaign, they described Coinbase's operations, "platform," and "flywheel" growth strategy without any reservations. This misrepresented to investors that the fundamentals behind Coinbase's historical success were still in place and functioning as normal. Under this misrepresentation, Defendants listed nearly 115 million shares of its Class A common stock on the Nasdaq Global Select Market allowing several of the Individual Defendants (defined below) to immediately sell hundreds of millions of dollars of stock to the public—$711,975,997 to be exact.

7.      Due to Defendants' promotional campaign and the damaged state of Coinbase's "platform" and "flywheel" growth strategy, Plaintiff and other public investors in Coinbase who

purchased shares in the Direct Listing unknowingly made an investment that was materially different and substantially riskier than what had been represented in the Registration Statement.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. §1331 and section 21D of the Securities Act (15 U.S.C. § 77v), this Court has jurisdiction over the claims asserted herein under Section 11 of the Securities Act.

9.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff has been a shareholder since prior to the start of the Relevant Period, is currently, and at all relevant times has been, a holder of Coinbase's common stock.

12.     Nominal Defendant Coinbase is incorporated in Delaware. Coinbase formerly maintained a corporate headquarters at 548 Market Street, San Francisco, California. In May 2020, the Company decided to become a "remote-first" company, meaning that its employees

would work primarily from remote locations. Notwithstanding the foregoing, Coinbase maintained corporate offices in the San Francisco Bay Area at the time of the Direct Listing, including San Francisco and Redwood City.

13.     Defendant Brian Armstrong ("Armstrong") is, and was at the time of the Direct Listing, Coinbase's Chief Executive Officer and Chairman of the Board. For the fiscal years of 2021 and 2020, Defendant Armstrong received $59,472,256 and $2,987,027 in total compensation, respectively. Defendant Armstrong reviewed, approved, and made the statements in the Registration Statement. At the time of the Direct Listing, Defendant Armstrong owned 2,753,924 Class A shares of Coinbase common stock and 36,851,833 Class B shares of common stock. Collectively, at the time of the Direct Listing, Defendant Armstrong held 21.5% of Coinbase's voting power.

14.     Defendant Alesia J. Haas ("Haas") is, and was at the time of the Direct Listing, Coinbase's Chief Financial Officer. For the fiscal year of 2021, Defendant Haas received $16,234,443 in total compensation. Defendant Haas reviewed, approved, and made the statements. At the time of the Direct Listing, Defendant Haas owned 511,000 Class A shares of Coinbase common stock.

15.     Defendant Jennifer N. Jones ("Jones") served as Coinbase's Chief Accounting Officer at the time of the Direct Listing. Defendant Jones reviewed, approved, and made the statements in the Registration Statement. At the time of the Direct Listing, Defendant Jones owned 230,385 Class A shares of Coinbase common stock.

16.     Defendants Armstrong, Haas, and Jones are collectively referred to herein as the "Officer Defendants."

17.     Defendant Marc L. Andreessen ("Andreessen") is, and was at all relevant times, a director of Coinbase. Defendant Andreessen reviewed, approved, and made the statements in the Registration Statement. At the time of the Direct Listing, Defendant Andreessen owned 5,516,037 Class A shares of Coinbase common stock and 23,961,498 Class B shares of common stock. Collectively, at the time of the Direct Listing, Defendant Andreessen held 14.1% of Coinbase's voting power.

18.     Defendant Frederick Ernest Ehrsam III ("Ehrsam") is, and was at all relevant times, a director of Coinbase. Defendant Ehrsam reviewed, approved, and made the statements in the Registration Statement. At the time of the Direct Listing, Defendant Ehrsam owned 2,570,459 Class A shares of Coinbase common stock and 15,114,503 Class B shares of common stock. Collectively, at the time of the Direct Listing, Defendant Ehrsam held 8.9% of Coinbase's voting power.

19.     Defendant Kathryn Haun ("Haun") is, and was at all relevant times, a director of Coinbase. Defendant Haun reviewed, approved, and made the statements in the Registration Statement. At the time of the Direct Listing, Defendant Haun owned 181,000 Class A shares of Coinbase common stock and 286,854 Class B shares of common stock.

20.     Defendant Kelly Kramer ("Kramer") is, and was at all relevant times, a director of Coinbase. Defendant Kramer reviewed, approved, and made the statements in the Registration Statement.

21.     Defendant Gokul Rajaram ("Rajaram") is, and was at all relevant times, a director of Coinbase. Defendant Rajaram reviewed, approved, and made the statements in the Registration Statement.

22.     Defendant Fred Wilson ("Wilson") is, and was at all relevant times, a director of Coinbase. Defendant Wilson reviewed, approved, and made the statements in the Registration Statement. At the time of the Direct Listing, Wilson owned 13,902,324 Class B shares of common stock, representing 8.9% of Coinbase's voting power.

23.     Defendants Armstrong, Andreessen, Ehsram, Haun, Kramer, Rajaram, and Wilson, are collectively referred to herein as the "Director Defendants."

24.     The Director Defendants, along with the Officer Defendants are referred to herein collectively as the "Individual Defendants."

25.     Coinbase and the Individual Defendants are collectively referred to herein as "Defendants."

26.     Related Party Non-Defendant Tobias Lütke ("Lütke") is currently a director of Coinbase. Lütke is named solely for the purposes of demand futility.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

27.     By reason of their positions as officers, directors, and/or fiduciaries of Coinbase, and because of their ability to control the business and corporate affairs of Coinbase, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Coinbase in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Coinbase and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.     Each director and officer of the Company owes to Coinbase and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

29.      In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

30.      Pursuant to the Audit Committee Charter of Coinbase (effective as of April 1, 2021)[3], the purpose of the Audit Committee is to assist the Board in fulfilling its oversight responsibilities relating to:

- the Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the Company's financial statements;

- the qualifications, independence and performance of the Company's independent auditors (the "Independent Auditors");

- the design, implementation and performance of the Company's internal audit function;

- risk assessment and management; and

- compliance by the Company with legal and regulatory requirements.

31.      The responsibilities of the Audit Committee include the following, among others:

**Financial Statements and Disclosures**

The Committee will:

1. Prior to distribution to the public, review and discuss with management and the Independent Auditors, the Company's quarterly and annual financial results, earnings press releases and earnings guidance provided to analysts and rating

---

[3] Available at https://s27.q4cdn.com/397450999/files/doc_downloads/gov_docs/Audit-and-Compliance-Committee-Charter.pdf.

agencies, and other public announcements regarding the Company's operating results.

2. Review and discuss the following with management, the internal auditors (if any), and the Independent Auditors, as applicable:

- the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K;

- the results of the Independent Auditors' audit or review of the financial statements;

- all critical audit matters (CAMs) proposed by the Independent Auditor to be included in the Independent Auditor's annual audit report;

- any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"); and

- any significant issues, events and transactions as well as any significant changes regarding accounting principles, practices, policies, judgments or estimates.

*      *      *

**Internal Controls**

With respect to the Company's internal controls, the Committee will:

1. Review and discuss with the Company's management, its internal auditors (if any), and the Independent Auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of the Company's accounting and financial processes and systems of internal controls and material changes in such controls, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation.

2. Review any allegations of fraud that are disclosed to the Committee involving management or any employee of the Company with a significant role in the Company's accounting and financial reporting process and systems of internal controls.

3. Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.

4. Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.

5. Establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (b) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Oversee the review of any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

\*      \*      \*

**Risk Oversight and Compliance**

The Committee will:

1. Review with management the Company's major financial risks and enterprise exposures and the steps management has taken to monitor or mitigate such risks and exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.

2. Review with management the Company's cybersecurity and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and respond to data breaches.

3. Review with management the Company's risk exposures in other areas, including credit, operational, technology, legal and compliance risk and any related policies, as the Committee deems necessary or appropriate from time to time.

4. Receive, as and when appropriate, reports and recommendations from management on risk tolerance, oversee the Company's process and policies for determining risk tolerance and review management's measurement and comparison of overall risk tolerance to established levels.

5. Review or discuss any comments or recommendations of outside counsel or outside experts with regard to risk and compliance, and, if appropriate, make recommendations to the Board regarding a schedule for implementing any

recommended changes and monitor compliance with any such Board-approved schedule.

6.  Review with management the Company's (a) programs for promoting and monitoring compliance with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.

7.  Review the status of any significant legal and regulatory matters and any material reports or inquiries received from regulators or government agencies that reasonably could be expected to have a significant impact on the Company's financial statements.

**<u>Duties Pursuant to the Company's Code of Business Conduct & Ethics</u>**

32.    The Individual Defendants, as officers and/or directors of Coinbase, were also bound the Company's Code of Business Conduct and Ethics (the "Code") which, according to the Code, "summarizes the ethical standards for all officers, employees, consultants, agents, representatives, independent contractors of the Company and members of our Board of Directors."

33.    Regarding financial disclosures, the Code states:

Company Members are expected to act responsibly and exercise sound judgment with respect to the Company's finances and financial reporting. Investors rely on accurate and fair financial and business information to understand our financial results and make informed decisions. Company Members may execute financial transactions only with authorization and in compliance with the Company's policies. Company members also are expected to record and report all financial transactions and business information honestly and accurately, to comply with the Company's system of internal controls and to follow applicable laws, regulations and accounting practices.

The Company regularly files reports and other documents with regulatory authorities, including the U.S. Securities and Exchange Commission ("SEC"). In addition, the Company may make other public communications, such as press releases, from time to time.

Depending upon the Company Member's position with the Company, the Company Member may be called upon to provide information to help ensure that the Company's public reports and communications are complete, fair, accurate and understandable. Company Members are expected to use all reasonable efforts

to provide complete, accurate, objective, relevant, timely and understandable answers to inquiries related to the Company's public disclosures. Company Members involved in preparing public reports and communications must use all reasonable efforts to comply with the Company's disclosure controls and procedures.

If any Company Member believes that any disclosure is materially misleading or if any Company Member becomes aware of any material information that such Company Member believes should be disclosed to the public, it is the Company Member's responsibility to bring this information to the attention of the Company's CLO. If the Company Member believes that questionable accounting or auditing conduct or practices have occurred or are occurring, the Company Member should follow the procedures set forth in the Company's Whistleblower Protection Policy.

34.     Concerning the Company's policy on SEC reporting and financial

statement preparation:

The Company's periodic reports and other documents filed with the SEC, *including all financial statements and other financial information, must comply with applicable federal securities laws, and SEC rules*. *Any Company Member that contributes in any way to the preparation or verification of the Company's financial statements and other financial information, must ensure that our books, records and accounts are accurately maintained*. Such Company Members must also cooperate fully with the Company's finance department, as well as the Company's independent public accountants and counsel. Any Company Member that is involved in the preparation of the Company's SEC reports or financial statements, must:

i.      *Be familiar with and comply with the Company's disclosure controls and procedures and the Company's internal control over financial reporting.*

ii.     *Take all necessary steps to ensure that all filings with the SEC and all other public communications about the Company's financial and business condition provide full, fair, accurate, timely and understandable disclosure.*

(emphasis added).

35.     Upon information and belief, the Company maintained versions of the Code

during the Relevant Period that imposed the same, or substantially and materially the same or

similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Coinbase, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Coinbase.

37.     Because of their advisory, executive, managerial, and directorial positions with Coinbase, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Coinbase.

38.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Coinbase and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

39.     To discharge their duties, the officers and directors of Coinbase were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Coinbase were required to, among other things:

        (a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Coinbase conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Coinbase was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

40.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Coinbase and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Coinbase, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Coinbase, the absence of good faith on their part, and a reckless disregard for their duties to Coinbase and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Coinbase.

41.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make

false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

42.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Coinbase has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

45.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or

negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### A.     Coinbase's "Platform" and "Flywheel" Strategy Attracted Investors

48.     Coinbase operates a "platform" that provides its users with an exchange to buy and sell cryptocurrencies. The "platform" is the medium through which Coinbase provides its users with its "complementary suite of products and services" that are responsible for generating the company's revenue. Coinbase's "platform" is "powered" by a proprietary "robust backend technology system that enables [it] to develop, launch, and market scalable new products and services."

49.     Coinbase's primary growth strategy was to implement and maintain what it referred to as its "flywheel" strategy. The "flywheel" consisted of three components: (1) expanding its "platform" by increasing the availability of crypto assets; (2) using the availability of crypto assets to attract additional users and generate growth in transactions and liquidity; and (3) leveraging the additional users and liquidity to further expand its "platform" with even more

crypto asset availability, which would drive new users to its "platform" and restart the cycle all over again.

50.     Coinbase discussed its "flywheel" repeatedly in the Registration Statement. According to Coinbase, the "flywheel" was a "virtuous cycle" and described it as follows: "Our unique approach draws retail users, institutions, and ecosystem partners to our platform, creating a ***powerful flywheel***: retail users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth of crypto assets that we offer, and launch new, innovative products and services that attract new customers" (emphasis added).

51.     When discussing Coinbase's "flywheel," the Registration Statement stated further that:

> Retail users and institutions come to Coinbase to discover and access the cryptoeconomy because our platform is safe, trusted, and easy to use. Expanding the depth and breadth of crypto assets that we support drives growth in transactions and assets on our platform, and enhances liquidity, in turn attracting more retail users and institutions. Our superior scale enables ecosystem partners such as asset issuers, merchants, and application developers to connect with millions of customers participating in the cryptoeconomy around the world. As customers and activity increase, we develop a deeper understanding of each customer's needs, allowing us to intelligently design, develop, and launch new innovative products. ***These products enhance the value of our platform, in turn attracting more customers and driving transactions, assets, and liquidity in a virtuous cycle.***

(emphasis added).

52.     Coinbase provided investors with the following depiction of its "flywheel" to investors:



53.     Defendants attributed Coinbase's operational success to the "flywheel." In pertinent part, the Registration Statement stated:

> We have seen this flywheel work effectively across our business and we have grown rapidly as a result. As of December 31, 2020, our customers had traded over $456 billion on our platform since inception and stored over $90 billion worth of assets across our platform. This growth has come with minimal outbound sales and marketing effort – since inception over 90% of our retail users had found us organically or through word-of-mouth. Since inception through December 31, 2020, we generated over $3.4 billion in total revenue, largely from transaction fees that we earn from volume-based trades on our platform by retail users and institutions. For the year ended December 31, 2020, transaction revenue represented over 96% of our net revenue. ***We have leveraged the strength of our trading business to scale and broaden our platform by investing in our flywheel to launch new products and services and grow the ecosystem.***

(emphasis added).

54.     Market analysts identified Coinbase's "flywheel" strategy as a material component to its overall growth strategy. For example:

    a.  On April 15, 2021, Loop Capital Markets initiated coverage with a "buy" rating and price target of $394 per share, reporting that: "the company is focused on growing subscription and services revenue through additional

product rollouts in the cryptoeconomy . . . . As more customers come to the platform, it will provide Coinbase with additional investment dollars to pour into new products on the platform… forming a virtuous circle."

b. On April 20, 2021, Rosenblatt Securities initiated coverage with a "buy" rating and price target of $450 per share, focusing on the "flywheel" in its report by, inter alia, providing investors with the "flywheel" depiction provided above as well as explaining that it "allows Coinbase to launch new, innovative products and services to attract even more new customers to its platform" which adds to the company's "scale and leadership position."

c. On May 10, 2021, Oppenheimer initiated coverage with a "buy" rating and price target of $434 per share, emphasizing the importance of Coinbase's "flywheel" growth strategy and explaining that: "When more retail users and institutions trade crypto and store assets in Coinbase's custody, it enables the expansion of crypto assets. With the increased users and liquidity in the platform, it draws ecosystem partners to connect with the customers to create new products. This flywheel creates a powerful virtuous cycle to the platform."

**B. Defendants Boosted Operations and Growth Prior to the Direct Listing**

55. Historically, "[Coinbase] spent less than 5% of net revenue on sales and marketing, and since inception, over 90% of [its] retail users had found [the Company] organically or through word-of-mouth." Defendants departed from this customer outreach approach though as Coinbase began preparing for the Direct Listing. Coinbase commenced a

substantial promotional and advertising campaign in 3Q20 contemporaneously with the filing of its preliminary draft registration statement. This is demonstrated by the sudden and sharp rise in Coinbase's "technology and development expenses" and "sales and marketing expenses" preceding the Direct Listing. Indeed, Coinbase's "sales and marketing expenses" as a percentage of net revenue increased from its traditional 5% level in 2020 to 7.3% in 1Q21 and then 9.6% in 2Q21 (*i.e.*, the quarter in which the Direct Listing occurred).

56.     Coinbase's "technology and development expenses include[d] costs incurred in operating, maintaining, and enhancing [its] platform, including network, website hosting, and infrastructure costs." Coinbase's "technology and development expenses" increased year-over-year from $185 million in 2019 to $272 million in 2020. According to Coinbase's Registration Statement, the increase in "technology and development expenses" was "primarily driven by a $53.5 million increase in personnel-related costs due to a 59% increase in overall headcount, a $13.6 million increase in software licenses, and a $13.1 million increase in website hosting costs to support the growth of our platform."

57.     Coinbase's "sales and marketing expenses primarily include[d] costs related to customer acquisition, advertising and marketing programs . . . ." Coinbase's "sales and marketing expenses" increased year-over-year from $24 million in 2019 to $57 million in 2020. According to Coinbase's Registration Statement, the increase in "sales and marketing expenses" was "primarily due to a $23.3 million increase in digital advertising spend, a $5.0 million increase in personnel-related costs, and a $3.9 million increase in customer referral and promotion fees." Personnel-related costs included the hiring of additional customer support agents necessitated by a sharp increase in inquiries. Whereas Coinbase received approximately

25,000 customer support inquiries per week in 2020, they jumped to "100,000 or more" per week in 1Q21.

58.     Coinbase's rise in "technology and development expenses" and "sales and marketing expenses" began in 3Q20, when Defendants filed the preliminary draft registration statement, and continued through 2Q21, the quarter in which the Direct Listing occurred. The following table provides the quarterly "technology and development" and "sales and marketing" expenses along with net revenue (in thousands) for FY2020 and the first half of FY2021:

| | Jun. 30, 2021 | Mar. 31, 2021 | Dec. 31, 2020 | Sep. 30, 2020 | Jun. 30, 2020 | Mar. 31, 2020 |
|---|---|---|---|---|---|---|
| Technology and development | $291,461 | $184,225 | $90,498 | $73,319 | $60,777 | $47,138 |
| Sales and marketing | $195,733 | $117,990 | $23,501 | $11,977 | $11,383 | $9,921 |
| Net Revenue | $2,033,011 | $1,596,981 | $497,091 | $286,663 | $178,331 | $179,082 |

59.     Coinbase stated in the Registration Statement that its "technology and development expenses remained relatively constant" in 2019 and increased in 2020 due to "increased headcount and increased costs due to the growth of our platform." It stated further that "sales and marketing expenses" had "trended upwards" primarily because of "the timing and magnitude of online advertising campaigns to increase traffic to [Coinbase's] platform." This trend continued in 1Q21 and 2Q21 due to increases in "digital advertising spend" and "customer referral and promotion fees."

60.     Coinbase utilized "key business metrics" to measure its operational growth. Two of these metrics, in particular, demonstrate the sudden and sharp increase in operations and growth just prior to Coinbase's Direct Listing: "Assets on Platform" and "Trading Volume."

61.     Coinbase described "Assets on Platform" as follows: "Assets on Platform is a measure of the scale of total value held on our platform. We believe Assets on Platform reflects the trusted nature of our platform and a monetization opportunity. Assets on Platform generate fees that are recorded as subscription and services revenue when customers engage with these products. The value of Assets on Platform is driven by three factors – the price, quantity, and type of crypto assets held by customers on our platform."

62.     Coinbase's "Assets on Platform" rose sharply in advance of the Direct Listing. As stated in the Registration Statement, "Assets on Platform has grown over the longer term from $7 billion to $17 billion to $90 billion as of December 31, 2018, 2019, and 2020, respectively, driven by growth in the price, quantity, and types of crypto assets we support."

63.     Coinbase also stated that its "Assets on Platform" "represented 11.1% of the total market capitalization of crypto assets, increasing from 8.3% and 4.5% as of December 31, 2019 and December 31, 2018, respectively," and that "[i]n 2020, [its] Assets on Platform initially decreased before subsequently increasing driven by growth in the quantity, price, and breadth of crypto assets we support."

64.     Coinbase provided the following chart of its "Assets on Platform" in the Registration Statement:



Assets on Platform and Crypto Market Capitalization



65.     As demonstrated above, Coinbase's "Assets on Platform" increased dramatically in 4Q20, nearly tripling in dollar amount from $36 billion to $90 billion. This trend continued in 1Q21, rising from $90 billion to $223 billion.

66.     Coinbase's "Trading Volume" followed a similar track, rising sharply in 4Q20. Coinbase provided the following chart of the "Trading Volume" on its platform in the Registration Statement:

Trading Volume and Crypto Asset Volatility



67. Coinbase's "Trading Volume" effectively doubled between 3Q20 and 4Q20, rising from $45 billion to $89 billion. This trend continued in 1Q21 jumping from $89 billion to $335 billion and in 2Q21 rising to $462 billion. Coinbase attributed its rise in "Trading Volume" during this period to "the addition of over 20 crypto assets, including multiple DeFi crypto assets . . . ."

68. Coinbase's operational growth in 4Q20 and 1Q21 was substantially greater than its growth prior to 4Q20. As demonstrated above, Coinbase's "Assets on Platform" remained relatively stagnant between 1Q18 and 1Q20, starting at $13 billion and ending at $17 billion. Additionally, its "Trading Volume" was similarly consistent, remaining at or well below $30 billion (except for 1Q18 where it reached $56 billion).

C.     **The Truth Reveals that the "Flywheel" Strategy Was Unworkable**

69.     Coinbase's "flywheel" strategy was viable only insofar as its "platform" could handle the trading volume generated by its users. Thus, when Defendants dramatically increased Coinbase's number of users in preparation for the Direct Listing, the "platform" was no longer able to sustain the volume necessary for the successful execution of Coinbase's core "flywheel" growth strategy. Coinbase's influx of new users and trading volume overpowered its "platform" and rendered its core "flywheel" strategy unworkable. Instead of adding liquidity to the "platform" and allowing Coinbase to expand its cryptocurrency offerings, the rush of new users resulted in significant service problems and interfered with Coinbase's adoption of in-demand digital assets.

70.     The incapacity of Coinbase's "flywheel" strategy became evident on May 13, 2021 when, Coinbase reported its earnings for 1Q21 after market hours. Revenue and earnings for the quarter were $1.801 billion and $3.05 per share, which missed analyst expectations of $1.81 billion and $3.07 per share.

71.     Coinbase also reported increased "unanticipated system disruptions" to its "platform," which the company described as "system disruptions" that "typically last from minutes up to a few hours and are caused by periods of significant unexpected trading activity that cause delays in [its] trading service." During "unanticipated system disruptions," Coinbase fulfilled customer transactions with its own crypto assets as an "accommodation" to its users. The revenue from the transactions was recorded as "other revenue" while the cost of the crypto assets used to fulfill the transaction was recorded as "other operating expense."

72.     Between FY2019 and FY2020, Coinbase's "unanticipated system disruptions" increased from six to 12. The increase in "unanticipated system disruptions" from FY2019 to FY2020 was "due to greater trading activity on Coinbase."

73.     In 1Q21, Coinbase experienced "five unanticipated system disruptions," nearly the entire number of disruptions experienced in 2019 altogether and almost half of all the disruptions in 2020. While Coinbase generated $105.5 million in "other revenue" from sales during these disruptions, its "other operating expenses" for the quarter included an increase of $176.1 million in "costs associated with crypto assets sold in order to fulfill customer accommodation transactions" during the "unanticipated system disruptions." This represented approximately 22.8% of Coinbase's overall net income for the quarter.

74.     Coinbase also reported delays in terms of expanding its "platform" to include additional cryptocurrencies. Dogecoin, in particular, would not be available on Coinbase's "platform" for at least another "six to eight weeks." In pertinent part, Armstrong stated during Coinbase's earnings conference call:

> And so we are putting a lot of work and thought into how do we accelerate our pace of asset addition. And one of those is Doge, as you mentioned, which has been getting a lot of attention recently. So to answer your question directly, *we plan to list Doge in the next six to eight weeks.* And then more broadly, we are going to be focused on how we can accelerate asset addition in the future.

(emphasis added).

75.     Coinbase's delay in terms of listing Dogecoin was significant given its popularity amongst cryptocurrency investors and its marked absence from Coinbase's "platform." Indeed, CoinDesk had previously reported on April 16, 2021 that Coinbase was "missing out on the latest frenzy" caused by Dogecoin. In pertinent part, CoinDesk reported that: "New shareholders of Coinbase might wonder, however, about the competitive disadvantage given that some of the

exchange's biggest global rivals have listed DOGE and appear to be lapping up the sudden spike in trading." CoinDesk stated further that, "[a]ccording to the website CoinGecko, most of the trading volume in dogecoin in the past 24 hours has come from the big exchanges Binance, OKEx and Huobi."

76.     Coinbase's inability to meet analyst expectations, the fragility of its "platform," and the unavailability of popular cryptocurrencies signaled to analysts and investors the unworkability of its core "flywheel" strategy. In response, numerous analysts immediately began to question Coinbase's vulnerability to competition, including:

a.     On May 13, 2021, Investor's Business Daily reported in pertinent part that "Coinbase stock slipped after hours on Thursday after the cryptocurrency exchange reported first-quarter results that slightly missed estimates." The report explained that, "The results arrived as the cryptocurrency exchange, the U.S.' largest, faces questions about rival crypto platforms, widening its product offerings and how it might put its cash to use." It also highlighted concerns over competition, referring to statements made by Coinbase in its earnings release: "'Competition is increasing as new market entrants join the cryptoeconomy every month,' Coinbase said in a letter to shareholders on Thursday. 'Our competitors are supporting certain crypto assets that are experiencing large trading volume and growth in market capitalization that we do not currently support, as well as offering new products and services that we do not offer'";

b.     On May 14, 2021, The New York Times reported in pertinent part that Coinbase's "rivals were swarming the market and increasing competition" and that "[t]he

company has been spending heavily on marketing and development to keep ahead

of its competitors";

and

c. On May 14, 2021, Blockchain.News reported that Coinbase's stock had declined

by 6.53% following the company's earnings announcement. The report also noted

Coinbase's "plans to list Dogecoin within the next eight weeks and increase the

speed at which the platform releases new products."

**D.      Defendants False and/or Materially Misleading Statements**

77.    The Registration Statement was negligently prepared and, as a result, contained

untrue statements of material fact or omitted to state other facts necessary to make the statements

made not misleading, and was not prepared in accordance with the rules and regulations

governing its preparation.

78.    In the "Prospectus Summary" section of the Registration Statement, Coinbase

described its "platform" and "flywheel" growth strategy as follows:

> We power the cryptoeconomy by combining the best of both emerging blockchain
> technology and traditional finance to create trusted and easy-to-use products for
> the industry. We have built a robust backend technology platform to support the
> global, real-time, and 24/7/365 demands of crypto asset markets. We invest
> heavily in regulatory compliance by working with regulators around the world to
> shape policy, and have pioneered industry-leading security practices for
> safeguarding crypto assets. Our early focus on trust and usability has allowed us
> to become the primary on-ramp to the cryptoeconomy from the fiat-based
> financial system.

> Our unique approach draws retail users, institutions, and ecosystem partners to
> our platform, creating a powerful flywheel: retail users and institutions store
> assets and drive liquidity, enabling us to expand the depth and breadth of crypto
> assets that we offer, and launch new, innovative products and services that attract
> new customers. Our scale and leadership position draws ecosystem partners to
> connect with our millions of customers around the world, further enhancing the
> value of our platform.

This self-reinforcing dynamic is enabled by our culture of repeatable innovation and continuous investment in our proprietary technology platform that is purpose built to address the unique engineering, cybersecurity, compliance, and usability challenges of directly interacting with blockchain protocols. With every turn of our flywheel, we develop a deeper understanding of our customers' needs and leverage our scalable platform to intelligently design, develop, launch, and market new, innovative products and services to our customers. This allows us to build a more tailored suite of products and services and enhances the value of our platform over time. By providing the necessary infrastructure and distribution for our current and future ecosystem partners to build and extend their reach, we also foster the growth of the ecosystem.

79.     Coinbase emphasized the strengths of its "platform" as a competitive advantage,

stating in pertinent part that:

We have developed a complementary suite of products and services that are designed to meet the distinct needs of our customers as they transact in the cryptoeconomy. Our customers – retail users, institutions, and ecosystem partners – come together on our platform to create a powerful flywheel for our business.

Our platform and flywheel are powered by a robust backend technology system that enables us to develop, launch, and market scalable new products and services. Our technology platform includes the following elements:

- **15+ native blockchain integrations and counting.** We have developed custom technology and processes to directly integrate with over 15 blockchain protocols and efficiently support new protocols.

- **Advanced cybersecurity and cryptography technology.** We have pioneered industry-leading standards for managing private cryptographic keys and use sophisticated cybersecurity technologies such as multi-party computation to safeguard a wide range of crypto assets.

- **Proprietary crypto compliance infrastructure.** We have built bespoke transaction monitoring systems to analyze crypto asset transactions in real-time on the blockchain, allowing us to support new products and services.

- **Powerful product experiences.** Investments in our technology platform give us the ability to create unique product experiences for our customers that allow them to easily participate in technically complex parts of the cryptoeconomy.

\*       \*       \*

- **We have a robust technology platform that enables unique product experiences for our industry.** Our custom technology platform is built to deal with the real-time, global and 24/7/365 nature of crypto asset markets, enabling us to rapidly research, develop, and launch new products and features.

80.     Coinbase reiterated the strength of its "flywheel" growth strategy later in the Registration Statement in the "MD&A" section, stating in pertinent part:

> Our unique approach draws retail users, institutions, and ecosystem partners to our platform, creating a powerful flywheel: retail users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth of crypto assets that we offer, and launch new, innovative products and services that attract new customers. Our scale and leadership position draws ecosystem partners to connect with our millions of customers around the world, further enhancing the value of our platform.
>
> This self-reinforcing dynamic is enabled by our culture of repeatable innovation and continuous investment in our proprietary technology platform that is purpose built to address the unique engineering, cybersecurity, compliance, and usability challenges of directly interacting with blockchain protocols. With every turn of our flywheel, we develop a deeper understanding of our customers' needs and leverage our scalable platform to intelligently design, develop, launch, and market new, innovative products and services to our customers. This allows us to build a more tailored suite of products and services and enhances the value of our platform over time. By providing the necessary infrastructure and distribution for our current and future ecosystem partners to build and extend their reach, we also foster the growth of the ecosystem.
>
> We have grown quickly and in a capital-efficient manner since our founding. However, similar to the evolution of the internet, e-commerce, and prior paradigm shifts in technology, our journey has not been linear. Due to the highly volatile nature of crypto asset prices and trading activity, historically our operating results have, and we expect will, continue to fluctuate significantly from quarter to quarter in line with market sentiment and trading activity. . . .

81.     Coinbase emphasized the importance of its "flywheel" growth strategy, stating in the Registration Statement that:

> We have seen this flywheel work effectively across our business and we have grown rapidly as a result. As of December 31, 2020, our customers had traded over $456 billion on our platform since inception and stored over $90 billion worth of assets across our platform. This growth has come with minimal

outbound sales and marketing effort — since inception over 90% of our retail users had found us organically or through word-of-mouth.

82.   Coinbase described its "flywheel" growth strategy in detail by providing the following statement when discussing its "platform":

> We have developed a complementary suite of products and services that are designed to meet the distinct needs of our customers as they transact in the cryptoeconomy. All of our customer-facing products and services are powered by a robust backend technology system that enables us to develop, launch, and market scalable new products and services.
>
> Our customers – retail users, institutions, and ecosystem partners – come together on our platform to create a powerful flywheel for our business.
>
> Retail users and institutions come to Coinbase to discover and access the cryptoeconomy because our platform is safe, trusted, and easy to use. Expanding the depth and breadth of crypto assets that we support drives growth in transactions and assets on our platform, and enhances liquidity, in turn attracting more retail users and institutions. Our superior scale enables ecosystem partners such as asset issuers, merchants, and application developers to connect with millions of customers participating in the cryptoeconomy around the world. As customers and activity increase, we develop a deeper understanding of each customer's needs, allowing us to intelligently design, develop, and launch new innovative products. These products enhance the value of our platform, in turn attracting more customers and driving transactions, assets, and liquidity in a virtuous cycle.



Crypto asset markets are natively digital, real-time, and operate globally on a 24/7/365 basis. The "always on" nature of the cryptoeconomy demands a more scalable and higher throughput technical architecture. Our proprietary platform is purpose-built to support the unique demands of the cryptoeconomy, and is built on top of modern technology designed specifically to address the unique engineering, cybersecurity, compliance, and usability challenges of emerging blockchain technology, while seamlessly connecting to legacy technology and financial systems. This infrastructure is highly extensible and investments we have made in platform-level capabilities allow us to quickly launch new products and services that accelerate our flywheel.

83.     The above statements were false and/or materially misleading because they described Coinbase's key operational and growth strategies without also disclosing that they had been materially weakened and disrupted by Defendants' promotional campaign prior to and during the Direct Listing.

84.     As alleged *supra*, Coinbase's "platform" and "flywheel" growth strategy were of central importance to the company's overall business and had been responsible for its historical growth and operational success. The Registration Statement repeatedly referred to these components of Coinbase's business as the cornerstones of its operations and integral to the growth it had achieved over the better part of the past decade prior to the Direct Listing. These components of Coinbase's business were material to investors, as demonstrated by the attention they received from analysts who were covering Coinbase prior to and during the Direct Listing (*e.g.*, Loop Capital, Rosenblatt Securities, Oppenheimer).

85.     However, contrary to the above statements in the Registration Statement, these components of Coinbase's operations had been adversely impacted by Defendants' promotional campaign. As alleged above, Defendants implemented an intense advertising and marketing push in advance of the Direct Listing that doubled and tripled trading volume and assets on Coinbase's "platform," respectively. This marked an abrupt and significant rise in "platform" traffic which had historically been moderately flat over the preceding two years. The strain on

Coinbase's "platform" resulted in increased system disruptions and delayed crypto asset offerings that interfered with its ability to compete with the competition, which only came to light when Coinbase reported its earnings for 1Q21, as alleged above.

86.     Coinbase also materially misled investors when discussing its customer outreach strategies, stating in pertinent part that:

> For the year ended December 31, 2020, we spent less than 5% of net revenue on sales and marketing, and since inception, over 90% of our retail users had found us organically or through word-of-mouth, reflecting the strength of our brand. We plan to make investments to efficiently drive retail user growth by expanding our marketing efforts across new and existing digital and offline channels.

87.     The statements identified above were false and/or materially misleading. The above statements indicated that Coinbase "plan[ned]" to "expand[] . . . marketing efforts" in the future, which indicated that the company's primary means of customer outreach were still "organic[]" and by "word-of-mouth." However, as alleged above, Coinbase was no longer attracting new users predominantly through "organic[]" means or "word-of-mouth." Defendants had already changed their outreach strategy with the commencement of their advertising and marketing push beginning in 3Q20 and continuing through the Direct Listing in 2Q21. Coinbase's "sales and marketing expenses" increased from under $12 million in 3Q20 to nearly $200 million in 2Q21 due to increases in "digital advertising spend" and "customer referral and promotion fees." Further, whereas Coinbase traditionally "spent less than 5% of net revenue on sales and marketing," it had spent 7.3% in 1Q21 and 9.6% in 2Q21.

88.     In addition to the foregoing, the Registration Statement failed to adequately describe the rising trend in "technology and development expenses" and "sales and marketing expenses" beginning in 3Q20 and continuing through 2Q21 in accordance with Item 303 of Regulation S-K, 17 CFR §229.303. As alleged above, these expenses "trended upwards" due to

"the timing and magnitude of online advertising campaigns to increase traffic to [Coinbase's] platform." This trend continued into 1Q21 and 2Q21. The expenses as a percentage of net revenue increased from less than 5% prior to the Direct Listing to 7.3% in 1Q21 and then 9.6% in 2Q21 (*i.e.*, the quarter in which the Direct Listing occurred) and amounted to a material change in business strategy and operational costs relative to historical periods.

89.     The Registration Statement's omission of the "unanticipated system disruptions" during 1Q21 also constituted a violation of Item 303 of Regulation S-K, 17 CFR §229.303. As alleged above, Coinbase experienced six disruptions in 2019 and twelve in 2020; in 1Q21 alone, Coinbase experienced five, which represented a sharp uptick in the rate and frequency of the disruptions in general. The disruptions constituted "unusual or infrequent events" that were material in terms of both the overall number of disruptions as well as the impact they would have on Coinbase's income given that the "other operating expense" associated with the disruptions amounted to approximately 22.8% of Coinbase's overall net income for the quarter.

90.     The Registration Statement also violated Item 105 of Regulation S-K, 17 CFR §229.105, by failing to disclose the specific risks arising from Coinbase's promotional campaign in advance of the Direct Listing and, in turn, the deterioration of its "platform" and central "flywheel" growth strategy. Coinbase's decision to increase users on its "platform" through the promotional and advertising campaign discussed above, marked a material change in its business and growth strategy which had previously been "organic[] or through word-of-mouth." The "risk factors" contained in the Registration Statement did not disclose the material adverse impacts of this change in strategy or Coinbase's recent and significant influx of customers, including in particular the strain on Coinbase's "platform" that resulted in increased system disruptions, delayed crypto asset offerings, and the breakdown of its traditional "flywheel" growth strategy.

Although these adverse effects had already occurred by the time of the Direct Listing, Coinbase did not disclose them and/or referred to them only generally and as risks that had not yet materialized.

91.     Coinbase cultivated an image of stability and security based on its proprietary and trusted "platform" and proven "flywheel" growth strategy. The Registration Statement repeatedly emphasized these core components of the business and identified them as the defining features of Coinbase's competitive advantage and business model. Contrary to what was stated in the Registration Statement, Plaintiff and other similarly situated investors who purchased Coinbase shares in the Direct Listing unknowingly invested in a company that did not have the cornerstones of its traditional operations in place and were not functioning as depicted in prior periods. Instead, the components of Coinbase's business that Defendants referred to as its key competitive advantages and/or strengths were broken and materially weakened as a result of Defendants' promotional actions occurring prior to and during the Direct Listing which marked a fundamental change in Coinbase's business strategy relative to what was described in the Registration Statement.

92.     The truth about these central components of Coinbase's operations would have, for a reasonable investor, significantly altered the total mix of information made available in the Registration Statement. When Coinbase reported its 1Q21 earnings after market hours on May 13, 2021, the effects of Coinbase's promotional and advertising campaign became known and the market reacted accordingly. As alleged above, Coinbase missed analyst expectations, reported increased "unanticipated system disruptions," and announced that it was attempting to increase the speed with which it would list new crypto assets, including Dogecoin which Coinbase said would not be listed for at least another six weeks despite its widespread demand

and popularity. This information led to a material and statistically significant decline in the price of Coinbase's stock as analysts and investors reassessed the value of its shares.

## DAMAGES TO COINBASE

93.     Coinbase has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Coinbase has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

      a.   costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

      b.   substantial loss of market capital;

      c.   costs already incurred and to be incurred defending the Related Securities Action; and

      d.   any fines or other liability resulting from the Company's violations of federal law.

94.     In addition, Coinbase's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

95.     The wrongdoing complained of herein has irreparably damaged Coinbase's corporate image and goodwill.  For at least the foreseeable future, Coinbase will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Coinbase's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

96.     Plaintiff brings this action derivatively in the right and for the benefit of Coinbase to redress injuries suffered, and to be suffered, by Coinbase as a direct result of violations of federal securities laws by the Defendants. Coinbase is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     The Board of Coinbase, at the time this action was commenced, consisted of Defendants Armstrong, Andreessen, Ehsram, Haun, Kramer, Rajaram, and Wilson, and Related Party Non-Defendant Lütke, a total of 8 individuals.

98.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Coinbase Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

99.     Each of the Director Defendants were responsible for reviewing and approving the Registration Statement. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

100.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

## Demand is Futile as to Defendant Armstrong

101.    Defendant Armstrong is Coinbase's co-founder and has served as Coinbase's CEO and a member of Coinbase's board of directors since the Company's inception in May 2012. As such, it is reasonable to infer that due to Defendant Armstrong's significant role within the Company, he would have been aware of the material misstatements made by Coinbase in its Registration Statement. Furthermore, Defendant Armstrong signed the Registration Statement.

102.    In his role as CEO of the Company for the fiscal years 2020 and 2021, Defendant Armstrong received $59,472,256 and $2,987,027 in total compensation, respectively.   The Company does not claim that Defendant Armstrong is an independent director and because his primary source of income and primary employment is his employment as CEO of Coinbase and his professional reputation is inextricably bound to his role at Coinbase, Defendant Armstrong is incapable of acting independently and demand is futile upon him.

## Demand is Futile as to the Director Defendants

103.    As alleged above, the Director face a substantial likelihood of liability for their misconduct. As more fully detailed herein, the Director Defendants participated and approved the Registration Statement in their capacity as Coinbase directors.  As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees, and directors, and attendance at management and Board meetings, each of the Director Defendants knew the adverse, non-public information regarding Coinbase's business and financial prospects before the issuance of the Registration Statement, yet each failed to prevent its release or correct the misleading and incomplete information contained therein. Moreover, as directors of Coinbase, these Defendants each had the duty and opportunity to discuss material information with management and fellow directors at any of the Board

meetings that occurred before the Company's Direct Listing, as well as at meetings of committees of the Board. Despite these duties, these Defendants caused or allowed, by their actions or inactions, the improper statements to be disseminated by Coinbase to the investing public and the Company's shareholders in connection with the Direct Listing.

104.    Accordingly, the above-named Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

**<u>Against the Individual Defendants for Contribution Under Section 11 of the Securities Act</u>**

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    As a result of the conduct and events alleged above, Coinbase has been named as a defendant in the Related Securities Action brought on behalf of Coinbase shareholders in which it is a joint tortfeasor in claims brought under Section 11 of the Securities Act of 1933.

107.    Federal law provides Coinbase with a cause of action against other alleged joint tortfeasors under Section 11(f).

108.    Accordingly, Plaintiff, on behalf of Coinbase, hereby claims contribution against the Individual Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Coinbase under Section 11, or if joined in such actions, would be liable for the same damages as Coinbase.

109.    Coinbase claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

110.    The plaintiffs in the Related Securities Action allege that the Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

111.    Coinbase is the registrant for the Direct Listing. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

112.    As issuer of the shares, Coinbase is strictly liable to plaintiffs and the Class for the misstatements and omissions alleged in the Related Securities Action.

113.    The plaintiffs in the Related Securities Action allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

114.    By reasons of the conduct therein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

115.    The plaintiffs in the Related Securities Action allege that plaintiffs acquired Coinbase securities pursuant and/or traceable to the Registration Statement for the Direct Listing.

116.    The plaintiffs in the Related Securities Action allege that plaintiffs and the Class have sustained damages. The value of Coinbase securities has declined substantially due to Defendants' violations.

117.    Accordingly, the Individual Defendants are liable for damages under Section 11(f) of the Securities Act, and, if Coinbase were to be held liable in the Related Securities Action, the Individual Defendants would be liable to it for contribution.  Plaintiff hereby derivatively claims such right of contribution on behalf of Coinbase.

**COUNT II**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    The Individual Defendants owed and owe Coinbase fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Coinbase the highest obligation of good faith, loyalty, and due care.

120.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Coinbase shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

121.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Coinbase to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Coinbase and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

122.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.    Plaintiff, on behalf of Coinbase, has no adequate remedy at law.

**COUNT III**

**Against all the Individual Defendants for Unjust Enrichment**

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Coinbase.

126.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Coinbase.

127.    Plaintiff, as a shareholder and representative of Coinbase, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

128.    Plaintiff, on behalf of Coinbase, has no adequate remedy at law.

**COUNT IV**

**<u>Against the Individual Defendants for Abuse of Control</u>**

129.    Plaintiff incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Coinbase and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

131.    As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

132.    Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

**COUNT V**

**Against the Individual Defendants for Gross Mismanagement**

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company.  Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

135.    Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

136.    By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Coinbase's affairs and in the use and preservation of Coinbase's assets.

137.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Coinbase to engage in the conduct complained of herein which

they knew had an unreasonable risk of damage to Coinbase, thus breaching their duties to the Company.

138.    As a result, the Individual Defendants grossly mismanaged Coinbase and should be liable to the Company for the resulting damages

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Coinbase and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Coinbase the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Coinbase and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Coinbase and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

       D.     Determining and awarding to Coinbase exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

       E.     Awarding Coinbase restitution from Defendants, and each of them;

       F.     Awarding Coinbase contribution from the Officer Defendants, and each of them.

       G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       H.     Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 4, 2022

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Email: rernst@bk-legal.com

**OF COUNSEL:**

Joshua M. Lifshitz
LIFSHITZ LAW PLLC
1190 Broadway
Hewlett, NY 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*